Pro Se 14 (Rev. 12/16) Complaint for Violation of Civil Rights (Prisoner)

# UNITED STATES DISTRICT COURT

for the

Western District of PA

Johnstown Division

| | | |
|---|---|---|
| Jamie McVicker | ) | Case No. 20 - 70 |
| _____ | ) | _____ |
| *Plaintiff(s)* | ) | *(to be filled in by the Clerk's Office)* |
| *(Write the full name of each plaintiff who is filing this complaint.* | ) | |
| *If the names of all the plaintiffs cannot fit in the space above,* | ) | |
| *please write "see attached" in the space and attach an additional* | ) | |
| *page with the full list of names.)* | ) | |
| -v- | ) | |
| | ) | |
| | ) | |
| " see attached " | ) | |
| _____ | ) | |
| *Defendant(s)* | ) | |
| *(Write the full name of each defendant who is being sued. If the* | ) | |
| *names of all the defendants cannot fit in the space above, please* | ) | |
| *write "see attached" in the space and attach an additional page* | | |
| *with the full list of addresses here.)* | | |

## COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

### (Prisoner Complaint)

---

**NOTICE**

Federal Rules of Civil Procedure 5.2 addresses the privacy and security concerns resulting from public access to electronic court files. Under this rule, papers filed with the court should *not* contain: an individual's full social security number or full birth date; the full name of a person known to be a minor; or a complete financial account number. A filing may include *only*: the last four digits of a social security number; the year of an individual's birth; a minor's initials; and the last four digits of a financial account number.

Except as noted in this form, plaintiff need not send exhibits, affidavits, grievance or witness statements, or any other materials to the Clerk's Office with this complaint.

In order for your complaint to be filed, it must be accompanied by the filing fee or an application to proceed in forma pauperis.

---

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF PENNSYLVANIA

**NAME AND ADDRESS OF PLAINTIFF**

Jamie McVicker  NM1576

SCI Houtzdale

209  Institutional Drive

Houtzdale,  PA  16698-1000

Plaintiff, Jamie McVicker, was confined as a pretrial detainee from February 27, 2017

until May 23, 2018 and as a convicted inmate from May 24, 2018 until August 01, 2018 in the

Municipal County Jail, located at 127 East Fairview Street in the city of Somerset in the state of

Pennsylvania.  The plaintiff is currently confined at SCI Houtzdale, located at 209 Institutional

Drive in the city of Houtzdale in the state of Pennsylvania.

Plaintiff, Jamie McVicker, is and was at all times mentioned herein, an adult citizen of

the United States  and a resident of the state of Pennsylvania.

**FULL NAME, TITLE, AND BUSINESS ADDRESS OF EACH DEFENDANT IN THIS ACTION**

Dr. Rita Comacho

229 S. Kimberly Avenue

Somerset,  PA  15501

Defendant, Dr. Rita Comacho, at all times relevant hereto, was the Medical Provider for

the Somerset County Jail from February 27, 2017 until August 01, 2018.  As the Medical

Provider of the jail, the defendant managed the Medical Department's day-to-day operations, overseen the medical treatment of all inmates incarcerated in the jail, and executed it's policies.  [here-in-after Dr. Comacho]

PrimeCare Medical Inc.
3940 Locust Lane
Harrisburg, PA 17109


Defendant, PrimeCare Medical Inc., at all times relevant hereto, was the Medical insurance Provider for the Somerset County Jail from February 27, 2017 until August 01, 2018.

## II.   PREVIOUS LAWSUITS

A.   The plaintiff avers no other lawsuits have been adjudicated regarding his medical condition and the facts involved in this case.

B.   Plaintiff asserts there were no prior disciplinary proceedings that deal with the same facts involved in this case.

## III.   FEDERAL LAWS VIOLATED

The plaintiff claims the following Federal Laws were violated; the **14th Amendment** as a pretrial detainee and the **8th Amendment** as a convicted inmate.

## IV.   STATEMENT OF CLAIM

At all times relevant hereto, defendants were "persons" for purposes of 42 U.S.C.

Section 1983 and acted under color of law to deprive the plaintiff of his constitutional rights, as set forth more fully below.

**FACTS :**

1       The events here-in-after described, occurred between February 27, 2017 and August 01, 2018 at the Somerset County Jail, and between October 22, 2018 and the filing of this claim at SCI Houtzdale.

2.      During the first week of the plaintiff's inception into the Somerset County Jail, a full Medical History was obtained by the Medical Department staff.

3.      On June 19, 2017, the plaintiff suffered the sudden onset of his symptoms.

4.      The plaintiff experienced extreme dizziness, nausea, an unsteady gait, and had a pounding headache over his left anterior portion of his forehead.  The plaintiff soon noticed that he had an inability to see out of his left eye and his vision, in general, was blurry.

5.      The plaintiff went to the Officer's desk to get Medical assistance around 1:30 p.m. and was seen by the LPN on duty (Angie) at 3:30 p.m.

6.      The plaintiff was called to the Medical Department around 7:00 p.m. and was evaluated again by the LPN on duty (Angie).

7.      After completion of her examination, the LPN informed the plaintiff that she would be notifying the Medical Doctor concerning his medical condition.

8.      No further medical treatment or emergency medical services were provided to the

plaintiff today by Dr. Comacho.

9.      On June 20, 2017, the plaintiff continued to experience the same symptoms as the previous day.

10.     The symptoms caused the plaintiff to stay in bed, as visual problems related to motion and light increased the intensity of his headaches.

11.     The plaintiff relayed his medical problem to the daylight Shift Nurse, but no medical treatment was provided by Dr. Comacho on this day.

12.     On June 21, 2017, the plaintiff woke up on Wednesday morning still experiencing the same symptoms he had during the onset of his medical condition.

13.     The plaintiff relayed his medical problem to the Nurse on duty, as Wednesday is the Somerset County Jail's sick call day with the Medical Provider, Dr. Comacho.

14.     The plaintiff was notified, by the Nurse on duty, that he would be called to sick call this morning.

15.     The plaintiff was never called to sick call, nor was any medical treatment provided by Dr. Comacho on this day.

16.     The plaintiff continued to remain in bed to subside his symptoms, as the blurred vision increased the intensity of his headaches.

17.     From June 22, 2017 through June 26, 2017, the plaintiff remained on bedrest as loud

noises and light enhanced his symptoms.

18.     On June 27, 2017, the plaintiff was transferred to Formica Optical in Somerset,

Pennsylvania for an appointment.

19.     The plaintiff was evaluated by Dr. Kimberly Riggs [here-in-after Dr. Riggs] and diagnosed

with a "swollen disc of the left eye".  Dr. Riggs verbally identified this condition to the plaintiff

as as **EMERGENCY** at this time.  (see Exhibit "A")

20.     Dr. Riggs decided to refer the plaintiff to Dr. Vittone's Office for evaluation.  (see Exhibit

"A")

21.     The plaintiff was transferred to Dr. Vittone's Office in Somerset, Pennsylvania and was

evaluated by Dr. Vittone.  (see Exhibit "B")

22.     Dr. Vittone confirmed the swollen disc of the plaintiff's left eye and identified this as

Optic Neuritis of the left eye in his impression.  (see Exhibit "B")

23.     Dr. VIttone ordered an MRI of the brain and orbits.

24.     Dr. Vittone verbally discussed his treatment plan with the plaintiff and informed the

plaintiff that the MRI was to determine the cause of the Optic Neuritis in his left eye.

25.     On June 28, 2017, the plaintiff went to the Medical Department to fill out and sign the

forms to have the MRI completed.

26.     On July 13, 2017, the plaintiff went to Somerset Hospital and had the MRI completed.

27.     On July 15, 2017, the plaintiff continued to verbally complain about his headaches related to the blurred vision and was ordered Tylenol B.I.D. prn.

28.     On July 25, 2017, the plaintiff continued to suffer from headaches related to his condition and had his Tylenol reordered.

29.     On July 31, 2017, the plaintiff had a follow-up appointment with Dr. Vittone.  (see Exhibit "D")

30.     Dr. Vittone notified the plaintiff that his MRI report had came back **"NEGATIVE"** with no findings.  (see Exhibit "C")

31.     The evaluation by Dr. Vittone shown the plaintiff's vision to be 20/200 in his left eye. (see Exhibit "D")

32.     The plaintiff notified Dr. Vittone of his Medical History of NonHodgkin's Lymphoma with subsequent chemotherapy treatment and his Mother's Medical History of ongoing migraine headaches and meningioma with subsequent surgical intervention.

33.     The plaintiff was placed on Baby Aspirin as he was verbally informed that Dr. Vittone felt there was a vascular occlusion.

34.     On August 5, 2017, the plaintiff verbally informed the Medical Department that his headaches continued from his Medical Condition and had his Tylenol reordered.

35.     On August 24, 2017, the plaintiff had bloodwork drawn that was ordered by Dr. Comacho.  (see Exhibit "E")

36.     On August 30, 2017, the plaintiff was called down to the Medical Department to be
seen by Dr. Comacho.

37.     The plaintiff had a physical examination performed by Dr. Comacho at this time.

38.     The plaintiff informed Dr. Comacho of his Medical History of NonHodgkin's Lymphoma,
his Mother's Medical History and mixed MRI results, and questioned the need for a (1)
Neurology Consult, (2) referral back to the plaintiff's Cancer Care Center for follow-up, (3) and
a needed PET scan as follows;

*"I have a history of NonHodgkin's Lymphoma and was treated with surgery and chemotherapy
back in the fall of 2013. I am due to return for a follow-up appointment with Dr. Sbeitan from
my Cancer Care Center in Johnstown, Pennsylvania and should have that scheduled. Dr. Sbeitan
had been performing yearly PET scans on me to montior my cancer after chemotherapy
treatment and I didn't receive one this year. The PET scans are to be performed yearly for a
period of five (5) years post chemotherapy treatment to ensure my cancer is in remission. Also,
my mother had a Medical History of ongoing migraine headaches and Meningioma of her right
eye with subsequent surgery. She had mixed MRI results during the course of her treatment,
which affected her diagnosis. My mother was referred to Neurology concerning her right eye
problem and received a proper diagnosis and treatment for her Medical Condition. Due to my
mother's Medical History, I feel I should be referred to Neurology as well since my current
Medical Condition is also a precursor to "MS" [Multiple Sclerosis].*

39.      On September 12, 2017, the plaintiff had a follow-up appointment with Dr. Vittone.
(see Exhibit "F")

40.     The plaintiff's vision in his left eye remained 20/200.  (see Exhibit "F")

41.     The plaintiff had his Aspirin increased to 325mg daily.  (see Exhibit "F")

42.     On October 16, 2017, the plaintiff had a follow-up appointment with Dr. Vittone.  (see

Exhibit "G")

43.     The plaintiff's vision in his left eye was 20/140.  (see Exhibit "G")

44.     On November, 15, 2017, the plaintiff was seen by Dr. Comacho.

45.     Dr. Comacho reviewed the bloodwork results with the plaintiff and identified the

elevation in his "ANA" results.  (see Exhibit "E")

46.     Dr. Comacho decided to order a Rheumatology consult for the elevation in the

plaintiff's "ANA".  (see Exhibit "H")

47.     The plaintiff had his Tylemol increased to T.I.D. prn for the headaches he had related to

his Medical Condition and visual problems.

48.     On January 3, 2018, the plaintiff was transferred to his Rheumatology consult at the

Altoona Arthritis & Osteoporosis Center.  (see Exhibit "H")

49.     Dr. Alan Kivitz [here-in-after Dr. Kivitz] ordered a variety of bloodwrok to test for

multiple forms of "Auto Immune Diseases", such as; Lupus and Raynaud's Disease.  (see Exhibit

"H")

50.     During this visit, Dr. Kivitz verbally informed the plaintiff of his recommendation for him

to be seen by his Cancer Care Center Doctor for his history of NonHodgkin's Lymphoma, and

also a Neurology consult for his Mother's Medical History of Meningioma in her right eye

orbital region and his current Medical Condition of Optic Neuritis.

*"I recommend that you return to your Cancer Care Center Doctor for follow-up for your*
*NonHodgkin's L:ymphoma.  You need to be seen for that.   I also recommend that you see a*

Neurologist since Optic Neuritis is a precursor to "MS" and because of your Mother's Medical History of Meningioma."

51.    On January 19, 2018, the plaintiff had a follow-up appointment with Dr. Vittone.  (see Exhibit "I")

52.    The plaintiff's vision remained at 20/140.  (see Exhibit "I")

53.    Dr. Vittone verbally questioned as to whether or not to inject the plaintiff's left eye to decrease the swelling of his left optic nerve.

"I am trying to determine whether or not to inject your left eye to decrease the swelling in your left optic nerve today.  Since the Rheumatologist recommended you go see a Neurologist, I will wait until you see them before I do that."

54.    On January 24, 2018, the plaintiff had his annual physical completed.

55.    On February 4, 2018, the plaintiff was notified that his bloodwork from his Rheumatology visit on 1-3-18 came back "negative".

56.    On or about February 4, 2018, the plaintiff had more labs ordered and had his Excedrin ordered B.I.D. prn for his headaches related to his medical condition and vision loss, by Dr, Comacho.

57.    On April 10, 2018, the plaintiff had a follow-up appointment with Dr. Vittone.  (see Exhibit "J")

58.    The plaintiff's vision in his left eye remained at 20/140.  (see Exhibit "J")

59.    On or about June 2018, the plaintiff placed a sick call slip into the medical Department since no other medical treatment had been ordered, outside of Dr. Vittone's Office visits, since his Rheumatology consult on 1-3-18.

60.    On July 11, 2018, the plaintiff was called to the Medical Department and was seen by Dr. Comacho.

61.    During this visit, the plaintiff verbally discussed the need for a follow-up MRI, a Neurology consult, and the likelihood of his condition being a precursor to "MS" with Dr. Comacho.  She stated the following;

*"You need to go see Neurology "ASAP".  When you get out or where ever you are going, you need to go see Neurology as soon as possible.  As far as the damage to your left optic nerve, I feel that vision loss is probably permanent since it has been over a year now.  I don't think there is anything that can be done now.  And yes, Optic Neuritis is a precursor to "MS", but "MS" would be hard to diagnose and would require a lot of testing, including a spinal tap.  And you would have to be sent to Pittsburgh for the testing and that would be very expensive."*

Based on my communication with Dr. Comacho, the plaintiff determined that she was not going to either consult a Neurologist or send him to be tested for "MS" because of it's cost.

62.    On August 1, 2018, the plaintiff was transferred up state, to SCI Greene.

63.     On August 11, 2018, the plaintiff was seen by a CRNP at SCI CampHill.

64.    The plaintiff verbally discussed his current Medical problem, his Medical History, and his family's Medical History with her at this time.

65.    The CRNP completed a consult for Optometry and paperwork for release of information for the plaintiff's Cancer Care Center Doctor, Dr. Sbeitan.  (see Exhibit "K")

66.     On August 16, 2018, the plaintiff was called to the Medical Department to electronically sign paperwork for release of information form his Cancer Care Center Doctor, Dr. Sbeitan.  (see Exhibit L")

67.     On October 30, 2018, the plaintiff was seen by CRNP, Thornley, at SCI Houtzdale and was referred to the Medical Director, Dr. Nagi for review of his Medical condition.

68.     On November 1, 2018, the plaintiff was seen by Dr. Nagi for his Medical condition and was referred to both Optometry and the Department of Correction's Cancer Doctor for his Medical History of NonHodgkin's Lymphoma.

69.     On November 30, 2018, the plaintiff was seen by Dr. Marcovitch (Optometry) in State College, Pa.  (see Exhibit "M")

70.     The plaintiff's vision in his left was 20/80 with pinhole testing.  (see Exhibit "M")

71.     On February 15, 2019, the plaintiff had a follow-up appointment with Dr. Marcovitch.  (see Exhibit "N")

72.     The plaintiff was diagnosed with diffuse retinal atrophy in the left eye and was referred to "Retina"  (a Retinal Specialist) for further evaluation of his left eye.  (see Exhibit "N")

73.     Dr. Marcovitch identified that it is unlikely that the plaintiff's vision in his left eye can be improved with treatment.  (see Exhibit "N")

74.     On April 7, 2019, the plaintiff placed a request slip into the Medical Department concerning the cause of his Medical condition being undiagnosed.  (see Exhibit "O")

75.     On April 8, 2019, the plaintiff recieved a response from the CHCA, Terri Sechrengost. (see Exhibit "O")

76.     On April 15, 2019, the plaintiff placed a sick call request slip into the Medical Department concerning his undiagnosed Medical condition and the need for a Neurology consultation.

77.     On April 17, 2019, the plaintiff was called to the Medical Department and discussed his Medical condition with CRNP Thornley.

78.     CRNP Thornley decided to refer the plaintiff to the Medical Director, Dr. Nagi.

79.     On April 19, 2019, the plaintiff was called to the Medical Department and was seen by the Medical Director, Dr. Nagi.  The plaintiff informed Dr. Nagi of his current Medical condition and vision problem.  The plaintiff also discussed a new problem related to his inability to concentrate during reading, writing, and studying.  This problem with concentration has been affecting the plaintiff's Schooling, church attendance, work performance, and simply watching television.  Dr. Nagi informed the plaintiff the following;

        "We will get you some glasses so you can see.  As for your lack of concentration, it is related to being in jail and the stress of that.  You should go see Psychology on your unit and they can put you on some medication and try that for a couple of weeks." The plaintiff informed Dr. Nagi; "I am not experiencing any forms of stress right now and has acclimated well to the Veteran's Service Unit he is assigned to.  I am employed, go to church, attend "AA" meetings and SMART recovery meetings, take vocational classes, and attend the regularly scheduled block meetings."

80.     On May 1, 2019, the plaintiff was evaluated by Dr. Cessna at Geisinger Opthamology for his Retina referral.  (see Exhibit "Q")

81.     Dr. Cessna identified a decrease in the plaintiff's visual acquity in his left eye and a history of Optic Neuropathy of the left eye.  (see Exhibit "Q")

82.     Dr. Cessna's plan was to follow-up prn (as needed) rendering no treatment option available.  (see Exhibit "Q")  The plaintiff spoke with Dr.  Cessna and was verbally informed;

*"There is nerve damage present to the left optic nerve as it is pale in color and the vision loss in your left eye cannot be corrected with glasses or lasik surgery.  I feel you probably had a mini stroke during the time of your sudden vision loss."*

83.     On July 1, 2019, the plaintiff placed a sick call slip into the Medical Department to discuss the findings from Dr. Cessna's Opthamology visit.

84.     On July 5, 2019, the plaintiff was called to the Medical Department and was seen by Ms. Peace, CRNP.  (see Exhibit "R")

*"Dr. Cessna instructed you to follow-up as needed prn and that since no follow-up or treatment plan was ordered, your vision loss in your left eye is probably permanent with no corrective measures."*

85.     On July 9, 2019, the plaintiff completed his grievance within 15 days of being informed of his permanent vision loss, and mailed his grievance to the Someerset County Jail's Warden, Dennis Vought, by certified mail.  (see Exhibit "S")

86.     Two affidavits of mailing were obtained for verification of the contents of the certified mail containing the plaintiff's grievance.

87.     On July 12, 2019, the plaintiff was seen by the Medical Director, Dr. Nagi.  (see Exhibit

"T")  Dr. Nagi informed the plaintiff of the following;

     *"There was no follow-up treatment ordered for the thinning of your left retina and there are no corrective measures for your vision loss."*

88.     On August 2  2019, the plaintiff filed his grievance appeal after receiving no response to his initil grievance filed on July 9, 2019, and because no response to his grievance was an "unsatisfactory  response" to the plaintiff regarding his grievance.  (see Exhibit "U")

89.     The plaintiff allowed 15 days plus mailing time for the Grievance Coordinator's response before filing his appeal to the Warden, as per jail policy.

90.     By August 23, 2019, the plaintiff denies ever receiving a response to his grievance appeal, thus making the grievance process "unavailable".

91.     On August 26, 2019, the plaintiff placed a request slip into Medical Records so he could personally review his Medical Records on file.

92.     On August 27, 2019, the plaintiff was called to Medical Records and reviewed his personal Medical Records.

93.     On October 22, 2019, the plaintiff placed a sick call slip into the Medical Department for an increase in his blurred vision, more frequewnt head aches, and the feeling of vertigo after short periods of reading or writing, as the plaintiff just recently started an "Electronics Program" in the Education Department.

94.     On October 25, 2019, the plaintiff was called to the Medical Department and was seen

by PA Nagle. (see Exhibit "V")

95.     The plaintiff voiced his concerns regarding his Medical Condition, the risk of "MS", and the need for Neurology intervention.

96.     The plaintiff was added to the MD line for review and reconsideration of Neurology consultation, but was denied. (see Exhibit "V")

97.     The plaintiff avers that he was incarcerated as a pretrial detainee during his injury.

98.     The plaintiff was held without bond, therefore voiding his opportunity to seek a second opinion or to receive emergency Medical treatment that was needed.

99.     The Supreme Court reasoned that since incarceration denied prisoners the ability to care for themselves, the government has an obligation to provide Medical care for them.

100.    This obligation is a legal duty to do something, and in this case it is a duty to provide adequate Medical care.

101.    To provide that adequate Medical care, the Somerset county Jail hired Dr. Comacho to carry out this obligation.

102.    Defendant Dr. Rita Comacho is a licensed professional with offices in Somerset County, Pennsylvania. Dr. Rita Comacho provided all Medical care to the plaintiff while he was incarcerated at the Somerset county Jail from February 27, 2017 until August 1, 2018.

103.    The plaintiff avers that shortly after arriving at SCI Houtzdale, he attempted to have his medical records from the Somerset County Jail released to his current medical provider, Dr. Nagi.

104.    The defendant, Dr. Rita Comacho, intentionally refused to forward the plaintiff's medical records to SCI Houtzdale's Medical Department in the end of 2018.

105.    This delay in access to the plaintiff's medical records delayed the treatment rendered to the plaintiff and made SCI Houtzdale's Medical Department completely unaware of the plaintiff's course of treatment, diagnostic testing, physician progress notes, and any outside consultations made.

106.    The plaintiff was forced to sign multiple DC-108 "Release of Information" forms to try to obtain his medical records from each outside facility that treated him while at the Somerset County Jail.

107.    The plaintiff sent a personal letter to the Somerset county Jail's Medical Department in April of 2019 and requested that his medical records be sent to SCI Houtzdale's Medical Department to assist in his medical treatment.  No response was received.

108.    Upon arrival at SCI Houtzdale, the Medical Department had placed the plaintiff in their hypertension clinic and treated his condition every six months.

109.    The plaintiff discussed his current treament plan with the medical staff and did not understand why he was on his current medication.  The medication ordered by Dr. Rita Comacho, indicated that the plaintiff had a significant health problem that it should be

treating.  The plaintiff had no known medical problem indicating that it should be prescribed.

110.    So the plaintiff again tried to gain access to his medical records by sending the Somerset County Jail a DC-108 "Release of Information" form on December 12, 2020 for review of his medical record concerning the diagnosis and treatment of his hypertension.  No response received from Dr. Rita Comacho.  (Exhibit "W")

111.    The Medical Records Department again tried to gain access to the plaintiff's medical records and sent a second DC-108 "Release of Information" form to the Somerset County Jail on February 12, 2021.  Ms. Gray requested all medical records for Hypertension and Optic Neuritis including; all notes, consults, labs, diagnostic studies, and general medical treatment. (Exhibit "X")

112.    All request for medical records from the Somerset County Jail's Medical Provider, Dr. Rita Comacho, were intentionally denied.  The plaintiff still has not gained access to his medical records and his previous medical treatment.


## V. C.  Exhaustion of Administrative Remedies

113.    The plaintiff received medical information from Dr. Cessna on May 1, 2019 that no treatment options were availbale to correct his vision.

114.    On July 1, 2019 the plaintiff filed a request slip to the Medical Department to discuss the above mentioned findings.

115.    On July 5, 2019 the plaintiff was called to the Medical Department and informed that his vision loss was permanent with no corrective measures.

116.    On July 9, 2019 the plaintiff filed a grievance and mailed it to the Warden at the Somerset County Jail. (Art. # 7018 2290 0000 4968 0563)

117.    The plaintiff followed the Somerset County Jail's Griveance Procedure Policy found on page 23 and 24 of thier Inmate Handbook and allowed for a minimum of 10 working days plus mailing time for the Grievance Coordinator to respond.  The plaintiff waited a total of 24 days.

118.    On August 2, 2019 the plaintiff filed his grievance appeal per jail policy on page 24 of the Inmate Handbook since "no response" was an "unsatisfactory response" to the plaintiff.

119.    The plaintiff will aver that he never received a response to his grievance appeal from the Warden prior to the filing of this law suit.


**Claim #1 :  Failure to Provide Adequate Emergency Medical Care**

120.    On June 19, 2017 the defendant, Dr. Rita Comacho, exercised deliberate indifference to the plaintiff's health and safety by failing to provide adequate emergency medical care. Defendant Dr. Rita Comacho intentionally did not send the plaintiff out to be evaluated by appropriate health care personnel after being made aware of the plaintiff's physical signs and symptoms he was suffering.  Defendant Dr. Riat Camacho intentionally refused to order any medical treatment for the plaintiff concerning the onset of his medical symptoms.

121.    As a result of Dr. Rita Comacho's deliberate indifference to the plaintiff's medical signs and symptoms, the plaintiff suffered headaches, nausea, left eye vision loss, vertigo, an unsteady gait, and extreme emotional distress.  Dr. Rita Comacho failed to provide the plaintiff with pain medication and an anti-emetis for his nausea.

**Claim #2 : Failure to Administer Adequate Medical Care During Sick Call**

122.    On June 21, 2017 defendant Dr. Rita Comacho exercised deliberate indifference to the plaintiff's health and safety by refusing to provide adequate medical care during sick call. Defendant Dr. Rita Comacho intentionally did not call or provide the plaintiff medical care during the operation of sick call on this day.  Dr. Rita Comacho arrived at the Somerset County Jail and held sick call for the entire jail population on Wednesday June 21, 2017.  The Defendant failed to provide medical treatment to the plaintiff for a period of eight days after the onset of his symptoms.

123.    As a result of Dr. Rita Comacho's deliberate indifference to the plaintiff's medical condition, the plaintiff suffered headaches, nausea, left eye vision loss, vertigo, an unsteady gait, and extreme emotional distress.  The plaintiff became incapacitated and therefore remained in bed to subside his symptoms, as the blurred vision, light, and loud noises increased the intensity of his headaches.

**Claim #3 : Failure to Provide Adequate Medical Care for the Plaintiff's Medical History**

124.    Defendants Dr. Rita Comacho and PrimeCare Medical Inc. exercised deliberate

indifference to the plaintiff's health and safety by refusing to provide oncology care to him for

his history of NonHodgkin's Lymphoma and post chemotherapy treatment.  Dr. Rita Comacho

and PrimeCare Medical Inc. intentionally did not provide the plaintiff any follow-up oncology

visits with his oncologist, Dr. Sbeitan, and intentionally refused to provide the plaintiff with a

needed Pet Scan.

125.    As a result of Dr. Rita Comacho's and PrimeCare Medical's deliberate indifference to the

plaintiff's health and safety, the plaintiff's health and safety was placed in an unwarranted and

excessively high  risk for injury.

**Claim #4 : Failure to Provide Adequate Medical Care by Failing to Follow Recommendations**

**of a Specialist**

126.    Defendants Dr. Rita Comacho and PrimeCare Medical Inc. exercised deliberate

indifference to the plaintiff's health and safety by refusing to follow the recommendations of a

"Specialist".  Dr. Rita Comacho and Prime Care Medical Inc. intentionally did not follow the

recommendations of Dr. Alan Kivitz, Rheumatologist.  The plaintiff's labratory tests warranted

the consultation with this specialist.

127.    As a result of Dr. Rita Comacho's and PrimeCare Medical's deliberate indifference to the

plaintiff's helath care, the  plaintiff continued to suffer headaches, nausea, left eye vision loss, vertigo, an unsteady gait, and extreme emotional distress.

## Claim #5   Failure to Provide Adequate Medical Care by Failing to Diagnose
## the underlying cause of the plaintiff's medical condition

128.   Defendants Dr. Rita Comacho and PrimeCare Medical Inc. exercised deliberate indifference to the plaintiff's health and safety by failing to diagnose the underlying cause of the plaintiff's medical condition.  Dr. Rita Comacho and PrimeCare Medical Inc. intentionally did not provide any further testing or consultations for the plaintiff knowing that all other testing and consultations done previously, had came back negative with no findings.

129.   As a result of defendants Dr. Rita Comacho's and PrimeCare Medical's deliberate indifference to the plaintiff's medical condition, the plaintiff continued to suffer from headaches, nausea, left eye vision loss, vertigo, an unsteady gait, extreme emotional distress, and an unnecessary risk for permanent injury.


## Claim #6   Failure to Provide Adequate Medical Care because of Budget Reasons

130.   Defendants Dr. Rita Comacho and PrimeCare Medical Inc. exercised deliberate indifference to the plaintiff's health and safety by refusing to provide the plaintiff with a Neurology consult and test for multiple sclerosis.  Dr. Rita Comacho and PrimeCare Medical intentionally refused to provide a Neurology consult, knowing that it was reccoemmended by the Rheumatologist and that the plaintiff's medical condition was a precursor to multiple sclerosis, because of the expense of sending the plaintiff to Pittsburgh, PA to be tested.

131. As a result of Dr. Rita Comacho's and PrimeCare Medical's deliberate indifference, the plaintiff continued to suffer from headaches, nausea, left eye vision loss, vertigo, an unsteady gait, and extreme emotional distress.

**Claim #7   Failure to Administer Adequate Medical Care by Persisting**

      **in an Ineffective Treatment Plan**

132. Defendants Dr. Rita Comacho and PrimeCare Medical Inc. exercised deliberate indifference to the plaintiff's health and safety by continuing in a course of treatment that was seen to be ineffective.  Dr. Rita Comacho and PrimeCare Medical failed to recognize that the current prescribed treatment plan was grossly ineffective and persisted in that prescribed treatment plan knowing the permanent injury would result.

133. As a result of Dr. Rita comacho's And PrimeCare Medical's deliberate indifference to the plaintiff's plan of care, the plaintiff has suffered permanent left eye vision loss that cannot be corrected with glasses or lasik surgery.  The plaintiff continues to suffer from headaches, vertigo, an unsteady gait, and extreme emotional distress from his medical condition.

**Claim #8   Failure to Provide Adequate Medical Care by Denying**

      **the Plaintiff his Medical Records**

134. Defendants Dr. Rita Comacho exercised deliberate indifference to the plaintiff's health and safety by refusing to provide his medical records.  Dr. Rita Comacho intentionally refused to send the plaintiff's medical records to the current Institution he is housed at for review.

135. As a result of Dr. Rita Comacho's deliberate indifference to the plaintiff's needs to have

available his medical records and to assist with his future medical treatment.  The plaintiff's

medical care was ultimately delayed and appropriate review of his past treatment was delayed

which prevented the plaintiff from receiving medical care in a timely fashion for his medical

condition and vision loss.

**VI.**   **Prayer for Relief**

Wherefore, the plaintiff respectfully prays that this court enter judgement granting the

plaintiff;

1.      A Declaration that the acts and ommissions described herein violated the plaintiff's

rights under the Constitution and Laws of the United States.

2.      A permanent unjunction ordering the defendants to immediately cease the denial of

access to needed health care.

3.      Compensatory Damages in the amount of $750,000.

4.      Punitive Damages in the amount of $750,000.

5.      a jury trial on all issues triable by a jury.

6.      All costs related to pursuing this civil action to be paid for by the defendants and / ot

7.      any other relief deemed appropriate and necessary by the court.

Jamie McVicker NM1576
SCI Houtzdale
209 Institution Drive
Houtzdale,  PA  16698